IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

KEVIN W. PIGFORD,           )
                            )
          Plaintiff,        )
                            )
     v.                     )     Case No.
                            )     14-4123-REL-SSA
CAROLYN W. COLVIN, Acting   )
Commissioner of Social Security, )
                            )
          Defendant.        )

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Kevin Pigford seeks review of the final decision of the Commissioner of

Social Security denying plaintiff's application for disability benefits under Title II of the

Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in finding that plaintiff

can lift more than ten pounds or be on his feet for more than two hours per day or both,

which is required for light work. I find that the substantial evidence in the record as a

whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's

motion for summary judgment will be denied and the decision of the Commissioner will

be affirmed.

## I.    BACKGROUND

On June 7, 2011, plaintiff applied for disability benefits alleging that he had been

disabled since August 10, 2010. Plaintiff's disability stems from a neck injury and lower

back problems. Plaintiff's application was denied on August 4, 2011. On November

19, 2012, a hearing was held before an Administrative Law Judge. On November 30,

2012, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On

March 12, 2014, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the

2

courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III.   BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.    Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

Case 2:14-cv-04123-REL   Document 28   Filed 09/28/15   Page 3 of 24

2.      Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.      THE RECORD

The record consists of the testimony of plaintiff and vocational expert Gary Weimholt, in addition to documentary evidence admitted at the hearing.

## A.      ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

### Earnings Record

The record shows that plaintiff earned the following income from 1977 through 2012:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1977 | $ 3,022.83 | 1995 | $ 3,298.89 |
| 1978 | 6,836.13 | 1996 | 15,804.40 |

4

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1979 | 5,276.57 | 1997 | 0.00 |
| 1980 | 7,262.05 | 1998 | 10,747.58 |
| 1981 | 3,263.19 | 1999 | 17,152.07 |
| 1982 | 0.00 | 2000 | 13,541.22 |
| 1983 | 251.75 | 2001 | 19,51.37 |
| 1984 | 4,463.47 | 2002 | 24,840.07 |
| 1985 | 9,478.60 | 2003 | 19,219.04 |
| 1986 | 10,603.69 | 2004 | 16,693.38 |
| 1987 | 10,739.75 | 2005 | 15,300.42 |
| 1988 | 11,508.98 | 2006 | 15,237.01 |
| 1989 | 11,410.29 | 2007 | 12,551.10 |
| 1990 | 7,951.06 | 2008 | 26,288.88 |
| 1991 | 10,556.11 | 2009 | 26,949.11 |
| 1992 | 4,549.24 | 2010 | 22,846.64 |
| 1993 | 0.00 | 2011 | 10,286.98 |
| 1994 | 11,209.00 | 2012 | 0.00 |

(Tr. at 131-133, 152-153, 158).

**Function Report**

In a Function Report dated June 23, 2011, plaintiff reported that a typical day will include attending an online class using his computer, watching television, preparing meals, doing a little housework, riding an exercise bike for 15 to 20 minutes, and sometimes doing laundry (Tr. at 189). Before his injury plaintiff was able to do yard

5

work "more than now" (Tr. at 190). He has trouble shaving his head because of pain in his right arm; getting dressed hurts; and he has trouble bathing, shaving and feeding himself because of pain in his right arm (Tr. at 190). Plaintiff is able to prepare complete meals, do light cleaning, do laundry, iron, dust, and perform light household repairs (Tr. at 191). He goes outside most days walking, driving, or riding in a car (Tr. at 192). He shops online or in stores three or four times a week for 30 to 45 minutes at a time (Tr. at 192). Plaintiff plays on the computer and watches television daily; he has gone fishing two or three times since his injury (Tr. at 193). He spends time with his daughter and plays with his grandson on most days (Tr. at 193).

Plaintiff's condition affects his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, concentrate and use his hands (Tr. at 194). He wrote, "I can only lift 15 pounds, it hurts squatting, kneeling, bending. I cannot stand for long periods. I can reach low, but not high. Walking but for very long, not yet. Sitting not for long. Hard to concentrate with headaches. Right hand numb a lot." (Tr. at 194). He can walk for 15 to 20 minutes before needing to rest for 5 or 10 minutes (Tr. at 194). He can pay attention for one hour (Tr. at 194). He can play on the computer for 45 minutes to an hour at each sitting (Tr. at 198).

**B.    SUMMARY OF MEDICAL RECORDS**

On March 24, 2010, plaintiff saw David Peeples, M.D., a neurologist (Tr. at 227-229, 233-240). At the time plaintiff was taking Clonidine (treats high blood pressure) twice a day, Naproxen (non-steroidal anti-inflammatory) once a day, and Tramadol (narcotic-like pain reliever) two or three times a day. Plaintiff admitted smoking a half a

6

pack of cigarettes per day.  Plaintiff self-reported pain ranging from 6 to 9 on a scale of 1 to 10 which occurred "all the time."  When asked to identify the heaviest thing he had lifted in the past week, he wrote, "my grandson."  Dr. Peeples reviewed an MRI of plaintiff's cervical spine dated January 21, 2010; occupational medicine notes; notes from Callaway Community Hospital emergency department; and x-rays of plaintiff's skull, face, and left wrist dated December 10, 2009.  Dr. Peeples noted that plaintiff's cervical spine MRI showed a small central/right lateralized disc protrusion[1] and spondylotic changes[2] at C4-5, but all other levels were normal.  On exam plaintiff had tenderness and pain in the cervical spine with extension (bending the head backward). "No shoulder impingement signs were appreciated.  Provocative tests for upper extremity entrapment neuropathy[3] were negative."  Plaintiff had normal muscle bulk, tone and power in his arms and legs.  Sensory exam was normal.  Gait and coordination were normal.  Dr. Peeples noted that further diagnostic testing was

---

[1]"Lateral" is an anatomical term meaning "side" and can refer to the left or right side of the body. A "disc protrusion" occurs when a disc located in between the vertebrae sags or bulges. A lateral disc protrusion, therefore, is a disc that is enlarged or bulging on the left or right side of the spinal column. When a disc protrusion occurs laterally, or on the side of the spinal column, there is a chance that the protrusion will press on a nerve root. The spinal column creates a strong, bony protection for the spinal cord, the bundle of nerves that travels from the brain to the lower back. At every level of the spinal cord, nerve roots branch off to the left and to the right. When a lateral disc protrusion occurs on the left or right side of the spinal column, the protrusion is in close proximity to nerve roots.

[2]Cervical spondylosis is age-related wear and tear affecting spinal disks in the neck. As the disks dehydrate and shrink, signs of osteoarthritis develop, including bony projections along the edges of bones (bone spurs).

[3] Any of a group of neuropathies, such as carpal tunnel syndrome, caused by mechanical pressure on a peripheral nerve.

necessary. "His symptoms of neck pain and right upper extremity numbness are compatible with cervical radiculopathy[4] and his cervical MRI reveals a herniated disc[5] at C4-5. An EMG/NCS[6] is appropriate to



**Herniated disk**

Herniated disk compressing nerve

Normal disk

Nucleus

Annulus

© MAYO FOUNDATION FOR MEDICAL EDUCATION AND RESEARCH, ALL RIGHTS RESERVED.

---

[4]Pain starting in the upper spine (neck) that causes pain, numbness, or weakness in the neck and going down the arm or arms.

[5]"A herniated disk refers to a problem with one of the rubbery cushions (disks) between the individual bones (vertebrae) that stack up to make your spine. A spinal disk is a little like a jelly donut, with a softer center encased within a tougher exterior. Sometimes called a slipped disk or a ruptured disk, a herniated disk occurs when some of the softer 'jelly' pushes out through a crack in the tougher exterior. A herniated disk can irritate nearby nerves and result in pain, numbness or weakness in an arm or leg. On the other hand, many people experience no symptoms from a herniated disk. Most people who have a herniated disk don't need surgery to correct the problem." http://www.mayoclinic.org/diseases-conditions/herniated-disk/basics/definition/con-20029957

[6]Electromyography (EMG) is a diagnostic procedure to assess the health of muscles and the nerve cells that control them (motor neurons). Motor neurons transmit electrical signals that cause muscles to contract. An EMG translates these signals into graphs, sounds or numerical values that a specialist interprets. An EMG uses tiny devices called electrodes to transmit or detect electrical signals. During a needle EMG, a needle electrode inserted directly into a muscle records the electrical activity in that muscle. A nerve conduction study, another part of an EMG, uses electrodes taped to

8

evaluate the extent and severity as well as age of duration of radiculopathy if present. His headaches . . . should improve when and if his neck pain improves. . . . If radiculopathy is present on EMG/NCS testing he may benefit from epidural steroid injections or a selective nerve root block. Evaluation by a spine surgeon may also be indicated. . . . If approved by his workers compensation carrier he will be seen in follow-up for EMG/NCS testing. In the interim he may work in a light duty capacity with no client interaction."[7]

On April 9, 2010, plaintiff saw Dr. Peeples and underwent an EMG and nerve conduction study (Tr. at 230-233). Plaintiff reported no change in his symptoms -- he still had neck pain and headaches. Plaintiff's coordination and gait were normal. After the EMG/NCS, Dr. Peeples noted "no supportive findings for a cervical radiculopathy or neuropathy." His EMG/NCS studies were normal. "If this is a radicular component, it is not severe enough at this time to reveal electrical or clinical changes. Given that it has now been four months since symptom onset I feel a spine surgery opinion would be appropriate. In the interim he may continue to work in a light duty capacity with no client interaction."

On May 5, 2010, plaintiff saw Theodore Choma, M.D., at the Missouri Spine Center (Tr. at 243-245, 369-371, 374). Plaintiff reported that any movement of the neck

the skin (surface electrodes) to measure the speed and strength of signals traveling between two or more points. EMG results can reveal nerve dysfunction, muscle dysfunction or problems with nerve-to-muscle signal transmission.

[7]Plaintiff was working with patients (or clients) in a psychiatric hospital and had been assaulted by one of the patients resulting in his on-the-job injury.

or shoulder exacerbated his pain, and local heat or rest helped relieve his symptoms.

Plaintiff rated his pain a 7 out of 10. "He tells me he has tried supervised physical

therapy and indeed he has extensive notes documenting his compliance with this. He

has also tried massage therapy, oral medications, as well as chiropractic manipulation

without result." Plaintiff had a current prescription for Tramadol up to 4 times a day as

needed and Naproxen twice a day. "He . . . smokes half a pack of cigarettes per day.

He has done so for the last 25 years." On exam he appeared to be "fairly

uncomfortable due to his neck and arm symptoms." Plaintiff's neck range of motion

was limited and brought him "significant neck pain." Spurling sign[8] was positive on the



right, negative on the left. He had some light touch loss of sensation over the right shoulder. Plaintiff's x-rays showed mild cervical spondylosis but overall he had a normal curvature of the spine (Tr. at 258). His January 2010 MRI was reviewed and showed C4-5 central disk protrusion with central cord indentation. Dr. Choma recommended a right C4-5 transforaminal epidural steroid injection followed by a diskectomy and fusion if plaintiff gets only temporary relief from the injection. "I will follow up with him in

about 2-3 weeks after his injection to assess his clinical response and we will make

further plans from there. In [the] meantime I will allow him to continue his light-duty

---

[8]The patient bends his head sideways and the doctor applies pressure to the top of the head; if the patient experiences pain or numbness on that side, the test is positive.

Case 2:14-cv-04123-REL   Document 28   Filed 09/28/15   Page 10 of 24

restrictions and I have written him prescriptions for Ultram [also called Tramadol, a narcotic-like pain reliever] and Flexeril [muscle relaxer]."

On June 4, 2010, plaintiff had an epidural steroid injection (Tr. at 359-363).

On June 10, 2010, plaintiff saw Brice Windsor, D.O., for a follow up on hypertension (Tr. at 420-421).  Plaintiff reported headaches.  He was continued on his same hypertension medications.

On June 28, 2010, plaintiff saw Dr. Choma for a follow up (Tr. at 353-355).  Dr. Choma noted that plaintiff had received significant relief from the epidural steroid injection but only for one to two weeks before returning to his pretreatment symptoms. Dr. Choma recommended an anterior cervical diskectomy with fusion.  He anticipated that plaintiff would not be able to return to limited duty at work until two months after the surgery and that it would be about four months postoperative before he could return to work free from restrictions.

On July 27, 2010, plaintiff was seen by Diane Mueller, a nurse practitioner, at Columbia Regional Hospital for a preoperative work up (Tr. at 246-248, 256, 323-326, 346-350).  He reported smoking about one pack of cigarettes per day but said he quit a week earlier.  Plaintiff's medications did not include a muscle relaxer but did include Tramadol and Naproxen in addition to hypertension medications.  On exam plaintiff's neck range of motion was "slightly limited on flexion-extension [bending the head forward and backward] and lateral movements due to pain and stiffness."  Ms. Mueller signed a work restriction form indicating that plaintiff was limited to lifting a maximum of 20 pounds; standing or walking for 4 to 6 hours per workday; sitting for 5 to 8 hours per

workday; and was never to bend, squat, climb, twist his body or use power tools (Tr. at 328).

On August 10, 2010, is plaintiff's alleged onset date of disability. On this day Dr. Choma performed a C4-5 anterior cervical diskectomy and fusion with left anterior iliac crest bone graft (Tr. at 249-253, 259-260, 318-322, 329-345). He was discharged the following day with prescriptions for Lortab (narcotic) and Flexeril (muscle relaxer) and with instructions not to lift anything heavier than approximately 10 pounds and to avoid bending, pushing, pulling, stooping or other strenuous activities. He was to follow up with Dr. Choma in four weeks.

On September 10, 2010, plaintiff saw Dr. Choma for a follow up (Tr. at 254-255, 309-310, 317). "He said his headaches improved as well as right arm radicular symptoms. Since he is feeling better, he has increased activity level in regards to walking and also tried working out with some dumbbells, which has caused him the pain and he stopped these activities. Otherwise he states he is doing well in this initial postoperative period." X-rays showed his postoperative implants to be well positioned. Dr. Choma told plaintiff he no longer had to wear the soft collar and he could start driving. "He will remain off work until he is seen back in follow up." Plaintiff was told to begin physical therapy in a month and return to see Dr. Choma in two months. Elavil[9] was prescribed to help with sleep; no other medications were prescribed.

On October 5, 2010, plaintiff saw Dr. Windsor for a follow up on hypertension and glucose intolerance (Tr. at 417-418). "Feeling fine, not exercising with recent neck

---

[9]Also called amitriptyline, an antidepressant often prescribed to treat insomnia.

surgery. . . .   The patient is a current cigarette smoker.  He smokes 1 pack per day."
Plaintiff's hypertension medication was continued without changes.

On November 15, 2010, plaintiff saw Dr. Choma for a follow up (Tr. at 306-308).
"He tells me that he still has some right shoulder and arm dysfunction as well as some
neck pain."  Plaintiff was participating in physical therapy.  Gait was normal.  X-rays
were taken.  "I do not believe that he is radiographically fused yet.  However, I will allow
him to [return to work on] light duty".  Plaintiff was given a prescription for Flexeril and
was again referred to physical therapy to increase his resistence exercises with his
arms.

On December 21, 2010, plaintiff saw Dr. Choma for a follow up (Tr. at 302-
303,305).  Plaintiff reported worsening neck and right shoulder pain after having begun
range of motion exercises with his physical therapist.  On exam he appeared "slightly
uncomfortable."  Plaintiff's upper extremity strength was normal.  His neck range of
motion was "clearly limited by pain."  X-rays were consistent with delayed union which
Dr. Choma believed to be irritated by aggressive range of motion work with therapy.  "I
would like him to discontinue physical therapy and take it easy with his neck.  I will let
him continue light duty with a 20-pound lifting restriction at work."  Dr. Choma
prescribed Flexeril (muscle relaxer) and told plaintiff to take Tylenol for pain.  Plaintiff
was told to return in two months and if radiographs showed signs of delayed union,
further surgery may be needed.

On February 16, 2011, plaintiff saw James Coyle, M.D., for a second opinion on
his cervical spine (Tr. at 386-387). Plaintiff was using Flexeril (muscle relaxer) and

13

Ibuprofen for his symptoms. He was on light duty with no patient contact at the hospital where he was working. Dr. Coyle instructed plaintiff to discontinue Ibuprofen, and he kept plaintiff on light duty at work.

On March 9, 2011, plaintiff saw Dr. Coyle for a follow up (Tr. at 384-385). Plaintiff continued to have neck and right arm pain. He also had numbness in his right thumb. The symptoms were progressively getting worse over time. Plaintiff had pain on range of motion of his neck. Plaintiff had tenderness on exam, pain on extension, weakness of the biceps and triceps. His CT scan showed nonunion of the fusion at C4-5 and an annular tear[10] at C5-6. Plaintiff reported that he had stopped smoking the summer before and had not resumed smoking;[11]



therefore, Dr. Coyle recommended revising the fusion and surgically addressing the annular tear. "He understands that he does have an increased chance of recurrent nonunion since he has already failed the first fusion." Dr. Coyle continued plaintiff on light duty. He anticipated that plaintiff could return to light duty eight to ten weeks after surgery and that he would reach maximum medical improvement 16 to 18 weeks after surgery.

---

[10]An annular tear occurs when the fibrous outer wall (annulus fibrosus) of an intervertebral disc is ruptured.

[11]However, on October 10, 2010, plaintiff was noted by his primary care physician to be a current smoker and this was two months after his neck surgery.

14

On March 23, 2011, plaintiff saw Dr. Windsor for a follow up on hypertension and glucose intolerance (Tr. at 414-416). Plaintiff continued to have neck pain. He was exercising regularly. He was told to follow up in six months.

On March 30, 2011, plaintiff had x-rays taken of his cervical spine which showed mild left neural foraminal narrowing at C4-5 (Tr. at 273).

On April 7, 2011, saw Dr. Coyle (Tr. at 284-294, 391-394). "He continues to have neck pain and right upper extremity pain. The pain starts in the right shoulder and radiates to the biceps and the radial aspect of the forearm. He has numbness in his right thumb and symptoms are progressively getting worse over time. He has had a CT scan which shows a nonunion of his fusion at C4-C5 with a retained interbody fusion graft. He also has an annular tear seen at C5-C6 on his MRI. He quit smoking last summer and has not resumed smoking." Dr. Coyle removed the hardware from plaintiff's earlier surgery and attempted another repair of plaintiff's cervical spine. Plaintiff's only medications at the time of his surgery were for hypertension. He had discontinued Flexeril in December 2011. He was given Tramadol before his surgery. On discharge plaintiff was told not to drive for two weeks. He was prescribed Vicodin (narcotic) for pain.

On April 21, 2011, plaintiff saw Nicole Meitz, a nurse practitioner in Dr. Doyle's office (Tr. at 383, 396). Plaintiff reported some improvement in his arm pain and hand numbness. He was taking two Vicodin (narcotic) per day, wearing a cervical collar, and

Case 2:14-cv-04123-REL   Document 28   Filed 09/28/15   Page 15 of 24

using a bone growth stimulator.[12]  Plaintiff's arm strength was noted to be good.

Plaintiff was kept off work and told to return in four weeks for a follow up.

On May 18, 2011, plaintiff saw Dr. Coyle for a follow up (Tr. at 382, 388, 395).

"His strength is excellent in the upper extremities.  He has some residual paracervical

pain.  His x-rays today look very good."  Dr. Coyle told plaintiff he could stop using the

cervical collar in the next few days.  "He may work at light duty with no direct client

supervision effective May 23, 2011.  He should do no work overhead and no impact

activities such as use of power tools or hammers."  Dr. Coyle indicated that plaintiff did

not need physical therapy but should continue using his bone stimulator.

On July 11, 2011, plaintiff saw Dr. Coyle for a follow up (Tr. at 404-406, 428).

Dr. Coyle noted that plaintiff had improved since surgery but "he still has some

paracervical pain and right arm pain."  Plaintiff had excellent biceps and triceps strength

and his x-rays looked "very good."  Dr. Coyle prescribed Celebrex (non-steroidal anti-

inflammatory) and stated that plaintiff "may work as long as he has no client

supervision."  The office visit report did not restrict plaintiff from performing overhead

work or lifting -- he was only restricted from supervising the patients at the hospital

where he worked (Tr. at 405).  He was told to return in four weeks at which time

physical therapy would be considered.

On August 8, 2011, plaintiff saw Dr. Coyle (Tr. at 424, 427).  "[H]e complains

primarily of headaches and stiffness in his neck.  His motor strength is intact. . . .  His x-

_____

[12]These devices stimulate the bone's natural healing process by sending low-level
pulses of electromagnetic energy to the injury or fusion site.

rays look very good. I released him last time to work with no direct client supervision.

At this point he may supervise clients. I am also going to give him a prescription for

ibuprofen and a prescription for low-dose Elavil to be taken only at night. He may start

physical therapy for soft tissue release modalities and a home exercise program. He

does not need any upper extremity strengthening exercises."

On October 24, 2011, plaintiff saw Dr. Coyle (Tr. at 422, 425). Dr. Coyle wrote a

letter to Marilyn Marx, R.N., at plaintiff's worker's compensation carrier.

> He is now six and a half months postoperative. He has intact motor strength in
> the upper extremities. He has some residual dysesthesia in the right upper
> extremity. He has about eighty percent of normal cervical rotation, flexion, and
> extension. X-rays are stable.

> At this point, he is at maximum medical improvement. He does not feel ready to
> go back to work because of his associated risks and activities. I discussed this
> with him. Based on his job, he feels there is an inherent risk of reinjury. This
> may be hazard of the job, and I do not see it changing over time. I advised him
> this is a decision he will need to make. At this point, he is at maximum medical
> improvement.

On May 16, 2012, plaintiff was seen by Dr. Windsor (Tr. at 412-413). Plaintiff

complained of chronic neck pain. He was prescribed Elavil and told to return in six

months. Flexeril was refilled.

## C.  SUMMARY OF TESTIMONY

During the November 19, 2012, hearing, plaintiff testified; and Gary Weimholt a

vocational expert, testified at the request of the ALJ.

### 1.  Plaintiff's testimony.

Plaintiff was 51 years of age at the time of the hearing and is currently 54 (Tr. at

27-28). Plaintiff is single, lives in a mobile home with his 30-year-old daughter, and has

a driver's license (Tr. at 28, 37-38). He has a GED and has taken some college courses (Tr. at 28). He has no source of income (Tr. at 39). He has exhausted his savings and his 401(k), and he recently applied for food stamps and Medicaid (Tr. at 39).

Plaintiff's past work includes loading boxes at a warehouse for Dollar General for two or three months, driving a truck for Capital Transports, supervising and working in a cleaning crew for American Building Maintenance, and supervising and working in a cleaning crew for Woodley Building Maintenance (Tr. at 30-31).

Plaintiff last worked at the Fulton State Hospital (a mental health facility) as a security aide, assisting clients if they needed anything, escorting them to meals or doctor appointments, and assisting in restraining them if necessary (Tr. at 29). He worked at this job for two years before his injury (Tr. at 30). Plaintiff was assaulted at work (Tr. at 34). Plaintiff had his first surgery in August 2010 and returned to work at the end of 2010 (Tr. at 28, 32). He had a second surgery in April 2011 (Tr. at 28). Plaintiff did not return to work after that second surgery (Tr. at 28-29). During the few months between his return to work and his second surgery, plaintiff was on light duty, answering phones and helping to write schedules (Tr. at 29). Fulton State Hospital will only permit employees who have been injured to work light duty for a certain period of time, and then the person is terminated because there really are not any light duty jobs there (Tr. at 40).

Plaintiff's surgery was on his cervical spine (Tr. at 32). He did not get any significant improvement in his symptoms (Tr. at 32). The second surgery was done

18

because the first one did not result in a fusion (Tr. at 32). Plaintiff's cervical spine is now worse than it was before he had any surgery (Tr. at 32, 44). He has pain when he turns his head or lifts it; and after being up and moving for a few hours, he has to lie down because his head gets heavy and his neck gets sore (Tr. at 33). If he is at home doing his "daily little housework," he will need to lie down with a heating pad after about two or three hours (Tr. at 33). Although he may have a little bit more flexibility since his surgeries, his pain is worse than before (Tr. at 44).

Plaintiff tried a bone stimulator after his second surgery but was told to stop using it (Tr. at 33). He tried physical therapy after each surgery but that made his condition worse (Tr. at 33-34). Plaintiff's pain goes into his shoulder blades, down his right shoulder and arm and into his right hand (Tr. at 34). Plaintiff is right-hand dominant (Tr. at 34). Plaintiff's pain comes and goes; and he gets a sharp, shooting pain if he moves a certain way (Tr. at 35). He has burning pain in his shoulder all the time (Tr. at 35). He has numbness and tingling in his arm and fingers (Tr. at 35).

Plaintiff has trouble sleeping because of his pain (Tr. at 35). He goes to bed around 10:30 or 11:00 but wakes up around 4:00 or 4:30 a.m. and is unable to go back to sleep (Tr. at 36). He tries not to take too much medication; he lies down and he takes hot showers in an attempt to lessen his pain (Tr. at 35). Plaintiff lies down during the day every day because it relieves some of the pressure on his neck (Tr. at 35). He lies down two or three times a day for an hour or so (Tr. at 35-36). Plaintiff has a prescription for muscle relaxers which he takes three or four times a week, but then he

has to lie down (Tr. at 38). He uses Ibuprofen every day (Tr. at 38). Plaintiff gets a lot of headaches (Tr. at 38-39). He has no side effects from his medication (Tr. at 39).

When plaintiff worked at Dollar General, he fell and hurt his lower back (Tr. at 36). That is why he left that job (Tr. at 36). As a result of this injury, he has pain and, if he stands for very long, his hips start feeling numb because of the pressure (Tr. at 36).

Plaintiff can lift 20 pounds with his left arm, he cannot lift anything of significance with his right arm, and if he tries to lift anything overhead it causes him a lot of pain (Tr. at 36-37). Plaintiff's doctors have all told him not to lift anything more than 20 pounds (Tr. at 44). Plaintiff has pain in his right arm if he tries to reach up and get something out of the cabinet (Tr. at 37). He can wash dishes by hand for 15 to 20 minutes tops (Tr. at 37). He tries to do all of the household chores, but he can only do each thing for a brief period of time before needing to rest (Tr. at 38). Walking does not bother plaintiff; he tries to walk every day (Tr. at 42). He rides his bicycle every day (Tr. at 42). Standing in a certain place or sitting still for a period of time is what puts pressure on his lower back (Tr. at 42).

Plaintiff does his own grocery shopping (Tr. at 42). He is taking some courses and spends his day reading his course materials, doing homework, watching television, or doing housework (Tr. at 42). Plaintiff was able to go fishing a few times over the summer; he throws his line out and leaves it there while he sits on the shore for about an hour (Tr. at 43). He likes to play games on his computer, and he does that for about 45 minutes before needing to get up and move around (Tr. at 43).

Case 2:14-cv-04123-REL   Document 28   Filed 09/28/15   Page 20 of 24

## 2. Vocational expert testimony.

Vocational expert Gary Weimholt testified at the request of the Administrative Law Judge. The first hypothetical involved a person who could perform light exertional work except that he could stand and/or walk for six hours per day, sit for six hours per day, and only occasionally lift up to ten pounds (Tr. at 48). The vocational expert testified that such a person could work as a cashier in a parking booth (cashier II, DOT 211.462-010), light and unskilled with an SVP of 2 -- this job requires lifting ten pounds or less on an occasional basis (Tr. at 48-49). There are approximately 1,500 jobs in the state, 75,000 in the country (Tr. at 49). The person could work as an information clerk, DOT 237.367-018, light and unskilled with an SVP of 2 -- lifting would be negligible in this job (Tr. at 49). The vocational expert testified that his opinion on this job differs from that in the Dictionary of Occupational Titles (Tr. at 49). There are approximately 1,200 such jobs in the state and 60,000 in the country (Tr. at 49).

The second hypothetical was the same as the first except the person would be limited to only occasional handling (Tr. at 49). The vocational expert testified that such a person could still perform the job of cashier II or information clerk (Tr. at 49). Even though the Dictionary of Occupational Titles states that frequent reaching and handling are required to be an information clerk or a cashier, the vocational expert's opinion is that the information clerk job could be performed with only occasional reaching and handling (Tr. at 49, 51). If the hypothetical person was limited to less-than-occasional reaching or handling, the person could not work as an information clerk (Tr. at 51).

The third hypothetical involved a person who would need on average two unscheduled 15- to 30-minute breaks in addition to regularly scheduled morning, afternoon and lunch breaks (Tr. at 49-50). The vocational expert testified that such a person could not work (Tr. at 50).

## V.   FINDINGS OF THE ALJ

Administrative Law Judge Dennis LeBlanc entered his opinion on November 30, 2012 (Tr. at 11-18). Plaintiff's last insured date is December 31, 2016 (Tr. at 13).

Step one. Plaintiff has not engaged in substantial gainful activity since August 10, 2010, his alleged onset date (Tr. at 13).

Step two. Plaintiff suffers from degenerative disc disease of the cervical spine, a severe impairment (Tr. at 13).

Step three. Plaintiff's impairment does not meet or equal a listed impairment (Tr. at 13).

Step four. Plaintiff retains the residual functional capacity to perform light work except that he can only occasionally lift up to ten pounds (Tr. at 14). With this residual functional capacity, plaintiff is unable to perform any of his past relevant work (Tr. at 17).

Step five. Plaintiff is capable of performing other jobs available in significant numbers, such as cashier II or information clerk (Tr. at 17-18). Therefore, plaintiff is not disabled (Tr. at 18).

Case 2:14-cv-04123-REL   Document 28   Filed 09/28/15   Page 22 of 24

## VI.    RESIDUAL FUNCTIONAL CAPACITY

Plaintiff argues that the ALJ erred in finding that plaintiff can perform light work because this would require him to be able to lift more than 10 pounds or be on his feet for more than two hours per workday or both.  "If the individual can only lift 10 pounds, and cannot be on his/her feet for more than two hours out of an eight hour day, that individual can only perform activities at a sedentary exertional level and nothing higher" which, because of plaintiff's age, would result in a finding of disabled.

A claimant's residual functional capacity is the most he can do despite the combined effects of all of his credible limitations. 20 C.F.R. § 404.1545.  An ALJ's residual functional capacity finding is based on all of the record evidence, including the claimant's testimony regarding his symptoms and limitations, the claimant's medical treatment records, and the medical opinion evidence. 20 C.F.R. § 404.1545; Wildman v. Astrue, 596 F.3d 959, 969 (8th Cir. 2010); Social Security Ruling 96-8p.

In this case, the evidence supports the ALJ's finding.  With regard to plaintiff's ability to lift, the record shows that Diane Mueller, a nurse practitioner, limited plaintiff to lifting 20 pounds prior to his first surgery.  After his first surgery (the same day as his alleged onset date), Dr. Choma limited him to lifting 10 pounds.  By December 21, 2010 (four months later), Dr. Choma limited plaintiff to lifting 20 pounds.  Three months after plaintiff's second surgery, Dr. Coyle's only restriction was that plaintiff not work with the patients at the hospital -- he imposed no lifting restrictions.  A month later, on August 8, 2011 (one year after plaintiff's alleged onset date), Dr. Coyle removed even that restriction.  He commented at that time that plaintiff did not want to return to his job at

23

the hospital due to his fear of being reinjured, not because of an inability to perform the job.

In a Function Report, plaintiff noted that he "can only lift 15 pounds," which is more than that required to support the ALJ's finding. Plaintiff later testified at the administrative hearing that he can lift 20 pounds and that all of his doctors have limited him to lifting no more than 20 pounds. Therefore, plaintiff's own allegations in the record contradict his argument in his brief.

As far as the walking required for light work, I note that no doctor ever limited plaintiff's walking except perhaps immediately after a surgery. Plaintiff testified at his administrative hearing that walking does not bother him.

Based on the above, I find that the substantial evidence in the record as a whole supports the ALJ's residual functional capacity assessment.

## VII. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
September 28, 2015

24